UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| BARBARA JEAN OVERBAUGH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. 1:14-cv-219 |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the Commissioner filed by the plaintiff, Barbara Jean Overbaugh, on July 22, 2014. For the following reasons, the decision of the Commissioner is **AFFIRMED**.

*Background*

The plaintiff, Barbara Jean Overbaugh, filed an application for Disability Insurance Benefits on October 4, 2011, alleging a disability onset date of March 31, 2010. (Tr. 16). The Disability Determination Bureau denied Overbaugh's application on December 28, 2011, and again upon reconsideration on February 24, 2012. (Tr. 16). Overbaugh subsequently filed a timely request for a hearing on March 1, 2012. (Tr. 16). A hearing was held on December 18, 2012, before Administrative Law Judge (ALJ) Maryann S. Bright, and the ALJ issued an unfavorable decision on February 27, 2013. (Tr. 16–25). Vocational Expert (VE) Sharon D. Ringenberg, Mickey Overbaugh, Overbaugh's husband, and Overbaugh testified at the hearing. (Tr. 16). The Appeals Council denied review on March 26, 2014, making the ALJ's decision the final decision of the Commissioner. (Tr. 3–5).

The ALJ found that Overbaugh met the insured status requirements of the Social Security Act through December 31, 2015. (Tr. 18). At step one of the five step sequential analysis for determining whether an individual is disabled, the ALJ found that Overbaugh had not engaged in substantial gainful activity since March 31, 2010, the alleged onset date. (Tr. 18). At step two, the ALJ determined that Overbaugh had the following severe impairments: degenerative disc disease and osteoporosis. (Tr. 18). However, the ALJ determined that Overbaugh's depression was non-severe because it did not cause more than a minimal limitation in her ability to perform basic mental work activities. (Tr. 18).

To determine whether Overbaugh's depression was severe or non-severe, the ALJ considered the Paragraph B criteria. (Tr. 19). First, the ALJ concluded that Overbaugh had a mild limitation in daily living activities. (Tr. 19). Overbaugh indicated that she washed dishes, did laundry, and cooked quick meals. (Tr. 19). She also stated that she could cook holiday dinners with her daughter's help. (Tr. 19). The ALJ found those daily living activities consistent with the record and concluded that Overbaugh had a mild limitation in handling her daily activities independently, appropriately, effectively, and on a sustained basis. (Tr. 19). Furthermore, Dr. Joelle Larsen, a State agency psychiatric consultant, also concluded that Overbaugh had a mild limitation in this area. (Tr. 19).

The ALJ, along with Dr. Larsen, also concluded that Overbaugh had a mild limitation in social functioning. (Tr. 19). Overbaugh reported that going to church and spending time with her daughters and granddaughter was uplifting. (Tr. 19). The ALJ found that consistent with the record and concluded that Overbaugh had mild limitations interacting independently, appropriately, effectively, and on a sustained basis with other people. (Tr. 19).

The ALJ, along with Dr. Larsen, found that Overbaugh had mild limitations in concentration, persistence, or pace. (Tr. 19). A consultative examination showed that Overbaugh had normal fine motor skills, normal concentration, and normal social interaction with remote and recent memory intact. (Tr. 19). The ALJ found that consistent with the record and with Overbaugh's daily living activities including watching television, reading, sewing, and attending to her dogs. (Tr. 19). The ALJ determined that Overbaugh had mild limitations in sustaining focus, attention, and concentration long enough to complete tasks commonly found in work settings sufficiently, timely, and appropriately. (Tr. 19).

The ALJ determined that Overbaugh had experienced no episodes of decompensation of extended duration. (Tr. 19). Additionally, Dr. Larsen indicated that Overbaugh's physical impairments rather than a mental impairment caused her functional limitations. (Tr. 19). Furthermore, she concluded that Overbaugh could complete a variety of tasks without interference. (Tr. 19). J. Sands, M.D., a State agency medical consultant, affirmed Dr. Larsen's opinion. (Tr. 19). The ALJ gave great weight to this opinion because it was consistent with the medical evidence. (Tr. 19). It was also consistent with Overbaugh's statement that her prescription for Celexa helped control her symptoms and that she had no problems getting along with people. (Tr. 19). Overbaugh also indicated that Celexa improved her relationship with her husband. (Tr. 19). The ALJ concluded that Overbaugh's medically determinable mental impairment was non-severe because it caused no more than a mild limitation in any of the first three functional areas and there were no episodes of decompensation. (Tr. 20).

At step three, the ALJ concluded that Overbaugh did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 20). In determining whether Overbaugh had an impairment or combination of

impairments that met or medically equaled the severity of one of the listed impairments, the ALJ

considered the criteria under Listing 1.04.  (Tr. 20).

The ALJ then assessed Overbaugh's residual functional capacity as follows:

> the claimant has the residual functional capacity to perform light
> work as defined in 20 CFR 404.1567(b).  The claimant is capable of
> lifting or carrying up to twenty pounds occasionally and ten pounds
> frequently.  The claimant can stand and/or walk for approximately
> six hours per eight-hour workday and sit for approximately six hours
> per eight-hour workday, with normal breaks and allowing her to sit
> or stand alternatively at will provided she is not off task more than
> ten percent of the work period.  The claimant is capable of
> occasional climbing, balancing, stooping, kneeling, crouching, and
> crawling.  Due to pain, work should be limited to simple, routine,
> and repetitive tasks involving only simple work-related decisions.

(Tr. 20).  In making this finding, the ALJ considered all symptoms and the extent to which those

symptoms reasonably could be accepted as consistent with the objective medical evidence and

other evidence.  (Tr. 20).  The ALJ followed a two-step process when considering Overbaugh's

symptoms.  (Tr. 21).  First, she determined whether there was an underlying medically

determinable physical or mental impairment that was shown by a medically acceptable clinical

or laboratory diagnostic technique that reasonably could be expected to produce Overbaugh's

pain or other symptoms.  (Tr. 21).  Next, the ALJ evaluated the intensity, persistence, and

limiting effects of Overbaugh's symptoms to determine the extent to which they limited her

functioning.  (Tr. 21).

Overbaugh has alleged disability due to back pain, back spurs, osteoporosis, degenerative

disc disease, scoliosis, spinal arthritis and spondylosis, diffuse osteopenia, and small Schmorl's

nodes on the spine.  (Tr. 21).  Overbaugh indicated that she did not need surgery but that she has

undergone injections and acupuncture, neither of which relieved her symptoms.  (Tr. 21).

Overbaugh also stated that she did not use a brace or cane.  (Tr. 21).  However, she noted that

she has used a hot rub or heating pad to relieve pain. (Tr. 21). Overbaugh claimed that she experienced pain in her hips and burning in her bones, but an x-ray did not reveal any impairment in her hips. (Tr. 21). Overbaugh also claimed that she could sit only for fifteen minutes at a time before a popping feeling in her back occurred and could stand only for five to ten minutes at a time in one spot. (Tr. 21). She also indicated that her hands became numb, but she could crochet still. (Tr. 21). Overbaugh reported that her prescription for Vicodin helped her symptoms, but it made her forget things. (Tr. 21).

The ALJ found that the objective medical evidence failed to provide strong support for Overbaugh's allegations of disabling symptoms and limitations. (Tr. 21). Overbaugh underwent a dual energy x-ray absorptionmetry scan that revealed her bone mineral density of the lumbar spine was consistent with osteoporosis. (Tr. 21). The scan also revealed that her lumbar spine was seven times more at risk for fracture than that of a young adult. (Tr. 21). However, given these medical findings, doctors prescribed only conservative treatments of pharmacotherapy, exercise, and calcium. (Tr. 21). Overbaugh also was not asked to come back for a follow-up examination for two years. (Tr. 21). Therefore, the ALJ determined that Overbaugh's symptoms were not severe because she did not need weekly or monthly examinations to treat her condition. (Tr. 21).

After the conservative treatment was unsuccessful, Overbaugh underwent many thoracic epidural steroid injections. (Tr. 21). Her physical examination revealed that she did not have cyanosis, clubbing, or edema in her extremities. (Tr. 21). Her musculoskeletal system examination revealed that she had back pain but did not have pain in the cervical spine, lumbar flexors, or upon axial rotation. (Tr. 21–22). The examination also revealed that Overbaugh had good range of motion in the neck region. (Tr. 22). An x-ray of Overbaugh's thoracic spine

revealed that she had diffuse osteopenia and a smooth minor convex left curvature of the thoracic spine, consistent with scoliosis or paraspinal muscle spasms. (Tr. 22). However, the test showed that Overbaugh had a normal vertebral structure. (Tr. 22). She was prescribed Flexeril for her back pain. (Tr. 22).

Overbaugh underwent a spine MRI, which showed that she had mild degenerative disc disease through her thoracic spine and a small left spur at C6-7. (Tr. 22). When her MRI results came back, Overbaugh told Robert Shugart, M.D., her examining physician, that she wanted to apply for disability. (Tr. 22). She asked Dr. Shugart about any restrictions, but he was unable to answer because she was not under physical therapy at the time. (Tr. 22). Dr. Shugart ordered home therapy for Overbaugh and restricted her from work for seven weeks to determine the injections' effectiveness. (Tr. 22). Dr. Shugart also told Overbaugh that she could return to work earlier if she felt better. (Tr. 22). After seven weeks, Dr. Shugart released Overbaugh without any restrictions because she was doing well and her injections were effective. (Tr. 22).

Overbaugh's treating physician, T.L. Shipe, M.D., indicated that she declined medical testing and treatment due to the cost and her lack of health insurance coverage. (Tr. 22). During Dr. Shipe's physical examinations, Overbaugh appeared to move slowly from sitting to standing, but her straight leg raises showed negative results. (Tr. 22). Dr. Shipe continued to prescribe Vicodin and made few changes to her usual prescriptions. (Tr. 22). The ALJ concluded that Overbaugh's prescribed mode of care effectively treated her symptoms. (Tr. 22).

A consultative examiner, Vijay Kamineni, M.D., noted that Overbaugh had decreased range of motion in her back, joint pain, and trouble walking. (Tr. 22). Her joint movement and lower extremities were normal, and she did not have any muscle weakness or pain. (Tr. 22). Overbaugh's straight leg test was positive but with pain at eighty degrees. (Tr. 22). She did not

perform the lumbar range of motion test because she said it would cause her pain. (Tr. 22). Dr. Kamineni also indicated that Overbaugh was able to perform her daily living activities but could not stand for any length of time. (Tr. 22). He also stated that Overbaugh could drive a car, but she did not drive while on pain medication. (Tr. 22). Dr. Kamineni indicated that Overbaugh's back prevented her from performing her duties at her last job, which required lifting forty pounds frequently, and that she could carry and lift ten pounds only for a short time and distance. (Tr. 22). He also stated that she could not sit for thirty minutes but needed to move and stand for ten minutes at a time. (Tr. 22). The ALJ gave Dr. Kamineni's opinion little weight because it relied on Overbaugh's subjective complaints rather than objective medical evidence. (Tr. 22).

State agency medical consultant Dr. Neal opined that Overbaugh could perform light exertional activities and all postural functions frequently. (Tr. 23). Dr. Neal gave Overbaugh's back pain a rating of three on a ten-point scale and referenced reports that she could perform her daily living activities. (Tr. 23). The ALJ gave Dr. Neal's opinion great weight because Overbaugh's degenerative disc disease and osteoporosis constituted an exertional level of less than light work. (Tr. 23).

The ALJ also considered testimony from Overbaugh's husband, Mickey Overbaugh. (Tr. 23). The ALJ gave Mr. Overbaugh's statements some weight because he was able to confirm Overbaugh's activities of daily living. (Tr. 23). Based on the evidence, the ALJ found that Overbaugh's impairments could cause the alleged symptoms but found her incredible regarding the intensity, persistence, and limiting effects of the symptoms. (Tr. 23).

Ultimately, the ALJ concluded that the objective medical evidence in the record supported her RFC assessment. (Tr. 23). The ALJ found that the objective medical evidence failed to corroborate Overbaugh's allegations regarding the severity of her impairment. (Tr. 23).

The ALJ also found that the medical evidence of record did not show any worsening of Overbaugh's impairments. (Tr. 23). She noted that Overbaugh worked at a medium exertional level previously and chose not to transfer to another plant after her job ended despite having that opportunity. (Tr. 23). The ALJ reiterated that she was prescribed conservative treatment and was directed to receive a follow-up evaluation after two years. (Tr. 23). Based on the two year follow up, the ALJ concluded that Overbaugh was receiving effective treatment. (Tr. 23).

The ALJ commented that Overbaugh received thoracic injections while she was working but not after she left her job. (Tr. 23). Therefore, she concluded that Overbaugh could perform her work duties with proper medication. (Tr. 23). The ALJ also indicated that Overbaugh watched television all day, played with her dogs, read the bible, texted her children, shopped, attended church, and taught Sunday school. (Tr. 23). Although Overbaugh alleged degenerative disc disease, osteoporosis, and diffuse osteopenia, the ALJ found that her daily living activities did not demonstrate a severe disability that would prevent her from performing basic work functions. (Tr. 23).

At step four, the ALJ found that Overbaugh could not perform her past relevant work. (Tr. 24). Considering Overbaugh's age, education, work experience, and RFC, the ALJ concluded that there were jobs in the national economy that Overbaugh could perform, including cashier (500 jobs regionally, 10,000 jobs in Indiana, and 400,000 jobs nationally), furniture rental consultant (300 jobs regionally, 3,000 jobs in Indiana, and 150,000 jobs nationally), and hand packager (50 jobs regionally, 1,000 jobs in Indiana, and 20,000 jobs nationally). (Tr. 24–25).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence."); *Pepper v. Colvin*, 712 F.3d 351, 361–62 (7th Cir. 2013); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see Bates*, 736 F.3d at 1098; *Pepper*, 712 F.3d at 361–62; *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Rice v. Barnhart*, 384 F.3d 363, 368–69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. §§ 404.1520**. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. §§ 404.1520(b)**. If she is, the claimant is not disabled and the evaluation process is over. If she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. §§ 404.1520(c)**; *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. **20 C.F.R. §§ 404.1520(e)**. However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1520(f)**.

First, Overbaugh has argued that the ALJ's adverse credibility assessment cannot withstand scrutiny because it was based on legally insufficient analysis. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013); *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles her opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *see Bates*, 736 F.3d at 1098.

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." **20 C.F.R. § 404.1529(a); *Arnold v. Barnhart***, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through

consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." **20 C.F.R. § 404.1529(c);** *see Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005) ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1; *see Moore v. Colvin*, 743 F.3d 1118, 1125 (7th Cir. 2014) ("'[T]he ALJ cannot reject a claimant's testimony about limitations on her daily activities solely by stating that such testimony is unsupported by the medical evidence.'") (quoting *Indoranto*, 374 F.3d at 474); *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities. (internal citations omitted).

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994); *see **Zurawski v. Halter***, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, she must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *2; *see **Minnick v. Colvin***, 775 F.3d 929, 937 (7th Cir. 2015) ("[A] failure to adequately explain his or her credibility finding by discussing specific reasons supported by the record is grounds for reversal.") (citations omitted); ***Zurawski***, 245 F.3d at 887; ***Diaz v. Chater***, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). She must "build an accurate and logical bridge from the evidence to [her] conclusion." ***Zurawski***, 245 F.3d at 887 (quoting ***Clifford v. Apfel***, 227 F.3d 863, 872 (7th Cir. 2000)). A minor discrepancy, coupled with the ALJ's observations is sufficient to support a finding that the claimant was incredible. ***Bates***, 736 F.3d at 1099. However, this must be weighed against the ALJ's duty to build the record and not to ignore a line of evidence that suggests a disability. ***Bates***, 736 F.3d at 1099.

Overbaugh has argued that the ALJ mischaracterized her daily activities and implied that she led an active lifestyle. She acknowledged that she shopped, socialized, played with her dogs, and taught Sunday school, but she has argued that the ALJ failed to consider that each of her daily living activities was limited by pain. Additionally, she has claimed that the ALJ failed to explain how her limited activities supported an adverse credibility finding. Overbaugh has

indicated that the ALJ failed to consider factors that supported her credibility including her work history, her husband's testimony, third party reports, and the consistency of her allegations. Moreover, because she has argued that the ALJ improperly relied on her daily living activities, she has claimed that the ALJ's credibility finding cannot stand because it would rely on the objective medical evidence only.

The Commissioner has indicated that the ALJ relied on several reasons to support her credibility finding including the objective medical evidence, that Overbaugh's impairments had not worsened, that conservative treatment was effective, and her daily living activities. The Commissioner has argued that the ALJ reasonably inferred that Overbaugh was not as limited as she claimed because her daily living activities were inconsistent with her claimed limitations. Additionally, she noted that the ALJ emphasized the medical evidence, Overbaugh's treatment, and that Overbaugh could perform a medium or heavy job with conservative treatment previously.

The ALJ's credibility finding was not patently wrong. First, the ALJ reviewed the objective medical evidence and noted inconsistencies between Overbaugh's allegations of disability and the evidence. Specifically, she noted that doctors prescribed conservative treatment for Overbaugh's osteoporosis and that they did not ask her to conduct a follow-up examination for two years. Therefore, the ALJ concluded that Overbaugh's symptoms did not require weekly or monthly examinations. The ALJ then summarized Overbaugh's medical treatment for her back pain. She indicated that Overbaugh underwent thoracic epidural steroid injections and that Dr. Shugart ordered home therapy and restricted her from work for seven weeks to determine whether the injections resolved her symptoms. The ALJ noted that Dr.

Shugart released her without any restrictions after the seven weeks because the injections were working.

The ALJ mentioned that Overbaugh declined medical testing and treatment because of the cost and her lack of health insurance coverage. Furthermore, she noted that Dr. Shipe, Overbaugh's treating physician, continued to prescribe Vicodin and made few changes to her usual prescriptions. Based on Dr. Shugart's and Dr. Shipe's medical records, the ALJ concluded that Overbaugh's prescribed care effectively treated her symptoms, an inconsistency with her allegations of disability. The ALJ also reviewed Overbaugh's activities of daily living, including the testimony from her husband. She noted that Overbaugh could wash dishes, went outside every day, shopped, paid bills, watched television or read all day, and played with her dogs.

Although the ALJ discounted Overbaugh's allegations of pain because they were inconsistent with the objective medical evidence, she made more than a single conclusory statement to explain her findings. The ALJ's decision contained specific reasons to discount Overbaugh's credibility that were supported by evidence in the record and statements from treating and examining physicians. The ALJ also obtained detailed descriptions of Overbaugh's daily activities from the testimony of her and her husband. The ALJ considered Dr. Shipe's and Dr. Shugart's conclusions on Overbaugh's pain limitations. Additionally, she noted the dosage and effectiveness of pain medication, treatment for pain relief, functional restrictions, daily activities, and the nature and intensity of the pain. Therefore, the ALJ minimally articulated her findings on Overbaugh's credibility and built a logical bridge from the objective evidence to her findings.

Next, Overbaugh has argued that the ALJ's RFC assessment was not supported by substantial evidence because it was incomplete and defied meaningful review. SSR 96-8p

explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation. In a section entitled, "Narrative Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis. This section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p (footnote omitted). Thus, as explained in this section of the Ruling, there is a difference between what the ALJ must contemplate and what she must articulate in her written decision. "The ALJ is not required to address every piece of evidence or testimony presented, but he must provide a 'logical bridge' between the evidence and his conclusions." *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). Although the ALJ does not need to discuss every piece of evidence, she cannot ignore evidence that undermines her ultimate conclusions. *Moore*, 743 F.3d at 1123 ("The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected.") (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)). "A decision that lacks adequate discussion of the issues will be remanded." *Moore*, 743 F.3d at 1121.

Overbaugh has claimed that the ALJ failed to consider the side effects from her medication and how they affected her concentration and ability to work. She noted that Vicodin

and Flexeril affected her concentration and that Vicodin made her feel "useless" or "cloudy." Additionally, Overbaugh believed that she could not take Vicodin while she was working because it "would affect her job."  Furthermore, she has argued that the ALJ did not acknowledge, account for, or consider the limitations caused by her medication's side effects.

The ALJ was not required to make specific findings concerning the side effects of prescription drugs on Overbaugh's ability to work.  *Herron*, 19 F.3d at 335.  However, the ALJ must include sufficient information for the reviewing court to determine whether the decision was supported by substantial evidence.  *Lewis v. Barnhart*, 201 F. Supp. 2d 918, 937 (N.D. Ind. 2002).  In this case, the ALJ noted that Vicodin made Overbaugh forget things and that it helped her symptoms.  However, she did not discuss explicitly Overbaugh's testimony that Vicodin made her feel "useless" or "cloudy" or that it negatively affected her attention, memory, and ability to work.  Additionally, the ALJ did not review Mr. Overbaugh's testimony corroborating her allegations.

However, the ALJ did indicate that a consultative examination revealed that Overbaugh had normal concentration and intact memory, which the Commissioner has argued was substantial evidence to support the RFC determination.  Moreover, the ALJ reviewed Dr. Larsen's opinion, which concluded that Overbaugh could attend to a variety of tasks without interference.  Furthermore, the ALJ found Overbaugh's subjective complaints incredible, which this court determined was not patently wrong.  A challenge to the ALJ's RFC finding that was "inherently intertwined with matters of credibility" will fail when the credibility finding was not patently wrong.  *Outlaw v. Astrue*, 412 F. App'x 894, 897 (7th Cir. 2011).

Although the ALJ did not confront all of Overbaugh's claims about her Vicodin side effects directly, she was not required to make a specific finding concerning the side effects.

Rather, the ALJ's decision only needs to be supported by substantial evidence. In this case, the ALJ found Overbaugh's subjective allegations incredible, she reviewed the objective medical evidence regarding Overbaugh's concentration and memory, noted that Vicodin made Overbaugh forget things, and found that Overbaugh could perform basic work functions based on her daily activities. Therefore, the ALJ built a logical bridge when discounting Overbaugh's complaints of Vicodin side effects.

Overbaugh also has claimed that the ALJ's sit-stand option defied meaningful review. The ALJ limited Overbaugh to jobs that allowed her to sit or stand at will as long as she was not off task more than ten percent of the work period. Overbaugh has argued that her sit-stand behavior would put her off task for more than ten percent of the workday because she needed to alternate between sitting, standing, and walking around. She has claimed that she needed to move around every fifteen minutes, which would take her off task more than ten percent of the time. Furthermore, Overbaugh has argued that the ALJ needed to explain why her testimony was rejected.

Here, the ALJ properly evaluated and rejected Overbaugh's claims about needing to walk around. The ALJ noted Overbaugh's allegations that she could sit only for fifteen minutes at a time and could stand only for five to ten minutes before needing to move around. Overbaugh's arguments regarding her need to walk around were subjective complaints that related to matters of credibility. As discussed above, the ALJ found Overbaugh's allegations incredible, and this court did not find that determination patently wrong. A challenge to the ALJ's RFC finding that was "inherently intertwined with matters of credibility" will fail when the credibility finding was not patently wrong. *Outlaw*, 412 F. App'x at 897. Moreover, the ALJ does not need to specify

which statements from Overbaugh were incredible or identify specific evidence that refutes the allegations. ***Jens v. Barnhart***, 347 F.3d 209, 213 (7th Cir. 2003).

Overbaugh has argued that her sit/stand allegation was consistent with the medical evidence because it was supported by Dr. Kamineni's opinion. However, the ALJ rejected Dr. Kamineni's opinion because it relied on Overbaugh's subjective complaints. Furthermore, this court has concluded that the ALJ properly weighed Dr. Kamineni's opinion, which is discussed more thoroughly below. Although the ALJ did not explain the sit/stand option explicitly, the RFC was supported by substantial evidence. The ALJ acknowledged Overbaugh's sit/stand allegation and found Overbaugh incredible. Furthermore, the ALJ indicated that the objective medical evidence did not support the severity of Overbaugh's alleged symptoms and limitations and rejected the opinion that supported her sit/stand allegation.

Finally, Overbaugh has claimed that the ALJ did not have good cause to reject Dr. Kamineni's opinion. Generally, an ALJ affords more weight to the opinion of an examining source than the opinion of a non-examining source but the ultimate weight given depends on the opinion's consistency with the objective medical evidence, the quality of the explanation, and the source's specialty. ***Givens v. Colvin***, 551 F. App'x 855, 860 (7th Cir. 2013); **20 C.F.R. § 404.1527(c)**. "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." ***Gudgel v. Barnhart***, 345 F.3d 467, 470 (7th Cir. 2003). An ALJ may give less weight to an examining source's opinion when it appears to rely heavily on the claimant's subjective complaints. ***Givens***, 551 F. App'x at 861; *see* **20 C.F.R. § 404.1527(c)(3)** ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give the opinion. The better

explanation a source provides for an opinion the more weight we will give that opinion."); ***Filus***

***v. Astrue***, 694 F.3d 863, 868 (7th Cir. 2012).

Overbaugh has claimed that the ALJ did not provide "good cause" for rejecting Dr.

Kamineni's opinion because the ALJ did not cite any evidence to support her reasoning.  The

ALJ gave little weight to Dr. Kamineni's opinion because she found that it relied on

Overbaugh's subjective complaints rather than the objective medical evidence.  However,

Overbaugh has argued that the report showed that she did not make any allegations to Dr.

Kamineni.  The Commissioner has claimed that Dr. Kamineni's opinion was not entitled to any

special significance because he was an examining source.  She also has argued that Dr.

Kamineni's opinion evidence was not well-supported because he did not rely on any clinical

evidence.  Moreover, she indicated that the ALJ gave Dr. Neal's opinion great weight and that it

was inconsistent with Dr. Kamineni's opinion.

The ALJ properly weighed Dr. Kamineni's opinion.  The ALJ can give less weight to an

examining source's opinion when that source relied heavily on the claimant's subjective

complaints.  ***Givens***, 551 F. App'x at 861 (citing **20 C.F.R. § 404.1527(c)(3)**).  The ALJ found

that Dr. Kamineni's opinion relied heavily on Overbaugh's subjective complaints regarding

sitting, lifting, and walking rather than on objective medical evidence.  The ALJ should rely on

opinions based on the objective evidence rather than subjective complaints from the claimant.

***Rice v. Barnhart***, 384 F.3d 363, 371 (7th Cir. 2004).  The ALJ also rejected Dr. Kamineni's

opinion because it was not well-supported by other evidence and it was inconsistent with other

substantial evidence within the record, including that of Dr. Neal.  Furthermore, Dr. Kamineni

offered no explanation for his restrictions.  The ALJ needed to minimally articulate her reason

for rejecting Dr. Kamineni's opinion, and substantial evidence supported her conclusion that the

opinion was not entitled to greater weight.

Next, Overbaugh has claimed that the ALJ should have recontacted Dr. Kamineni if she found his opinion questionable or doubtful. *See* **20 C.F.R. § 404.1519p(b)**. The ALJ must recontact a treating source when the record is insufficient to make a decision. ***Simila v. Astrue***, 573 F.3d 503, 516–17 (7th Cir. 2009); ***Skarbek v. Barnhart***, 390 F.3d 500, 504 (7th Cir. 2004). "An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled." ***Skarbek***, 390 F.3d at 504 (citing **20 C.F.R. § 404.1512(e)**). Here, the record was not insufficient to make a decision. Rather, the ALJ found that Dr. Kamineni's opinion was not supported by anything in the record except for Overbaugh's subjective complaints. Nothing shows that the ALJ had any questions or doubts about Dr. Kamineni's opinion. Therefore, the ALJ did not have a duty to recontact Dr. Kamineni for clarification.

Based on the foregoing reasons, the decision of the Commissioner is **AFFIRMED**.

ENTERED this 13th day of July, 2015.

/s/ Andrew P. Rodovich
United States Magistrate Judge